Donald Kilmer, appearing for the appellants. May it please the court. This case raises significant equal protection and First Amendment issues. It has, nevertheless, been caught in a whirlwind of constitutional litigation arising out of the once dormant but now vibrant Second Amendment. At least three other appellate cases in this circuit are on hold, and I'm personally aware of at least two other district court cases on hold for the opinion that will come out of this court. The threshold issues on Second Amendment claims were initially resolved by Heller and McDonald dealing with whether it's an individual right or whether or not it is incorporated against the states. The last, or at least the next, task for litigants and jurists in this case, in these kinds of cases, is judicial analysis or scrutiny. One approach is to try and shoehorn the Second Amendment into a traditional three-tiered scrutiny, strict, intermediate, or rational basis. Counsel, before we get into the standard of review, though, wasn't Judge O'Scanlan correct that this case, admittedly, has been going on forever? We're very much aware of that. But doesn't this case have to go back to the district court for there to be an amendment the pleadings conform to the many constitutional changes, and from my perspective, even more importantly, to have some discovery done to find out exactly what's involved here? Are they selling AK-47s? Are they selling tanks? Are they selling just individual handguns? Doesn't that make a great deal of difference to our analysis under both Heller and McDonald? Yes, Your Honor, it does. And in fact, and that may be an appropriate order out of this to send us back to the district court, but only after we have established a Ninth Circuit rule for scrutiny. How can we determine that, though, if we don't know what we're dealing with? If you said to me, they're selling AK-47s, I would probably tell you that under, I think it's footnote 26, that that's not covered by the Second Amendment under the presumption that that's not a traditional home protection or self-protection mechanism, and therefore, we don't get to it because it's a constitutional issue. Where am I wrong on that? Well, AK-47s, Your Honor, are, if you're speaking of fully automatic weapons, are already illegal under state and federal law. California strictly also regulates so-called assault weapons or semi-automatic rifles, which are also either tightly controlled or unavailable to the public at all at the gun shows. And that may ultimately determine the issue, but what I'm saying is that, at least based on the record that I've seen, I have no idea what your clients want to sell at the county fair. Are you missing something in the record? Your Honor, there is something in the record in the form of what is not in the record, and that is that the county has conceded that the Nordyke's gun shows comply with all state and federal laws. So it is already a law-abiding gun show. We're complying with state law. We're complying with federal law. No illegal weapons are being sold at our gun shows. Isn't there also a scope question, though, as to the place? In other words, have the Supreme Court cases to date told us whether the Second Amendment applies beyond the context of protecting the home and applies in particular on government property? So before we get to scrutiny, don't we have to have a scope discussion beyond even the one that Judge Smith has remarked about? I believe most of the circuit courts and the district courts that have dealt with this issue have engaged in a two-step analysis, first to determine whether or not the right sought to be protected is within the scope of the Second Amendment, and then the courts went on to do some kind of scrutiny analysis. What is your position regarding the geographic scope of the Second Amendment? Does it apply, for example, to allow you to bring firearms into the courthouse or into a school or onto a public fairground? Peddler dealt with that issue specifically by referencing that regulations on sensitive places may in fact still be lawful under a reinvigorated Second Amendment. The problem is that we don't have a definition of sensitive place beyond courtrooms or school grounds. The problem with the fairgrounds being bootstrapped into a sensitive place is that there's absolutely no evidence in the record to suggest that it's a sensitive place like a courthouse. Well, doesn't that get back to Judge Smith's suggestion that maybe what we need is a fuller factual record before we answer the difficult question of whether this is or is not a sensitive place within the meaning of that footnote in Heller? The answer is yes, Your Honor. We may need to go back to the district court to develop the record. The problem is that the fairgrounds are not even a traditional sensitive place. A sensitive place like a courthouse where there are, for instance, metal detectors at the entrance so that only the bailiffs and marshals who control the courthouse are armed in a courthouse. A school ground is also considered a traditional sensitive place. Jails and prisons are also considered sensitive places where the general public can't have arms. It's also interesting to note that the county doesn't even treat the fairgrounds as a sensitive place with respect to firearms because they allow people with concealed carry permits, for example, as an exception to their ordinance. They have an exception to the ordinance for entertainment and motion picture production. So the fairgrounds are not sensitive per se to guns. But when you say we need to develop the factual record, are you conceding that the proposed second amended complaint is making an as-applied challenge, not a facial challenge to the ordinance? Initially we couched our claims as both as-applied and also a facial challenge, Your Honor. The attempt to amend the second amended complaint was, I think even in a footnote in the second amended complaint, we conceded that in the Ninth Circuit that this would probably fail. We simply pled it to preserve the issue. Now that there's been a robust resurrection of the second amendment or reinvigoration of the second amendment, it's going to be necessary to develop a fact pattern, correct? How do we know that it's not futile, that you actually could state a claim under the second amendment? Because then we'd have to take a look at what the scope of the second amendment provides, Your Honor. And our position is that the scope of the second amendment includes carrying firearms. Heller told us that bear means carry. And what we're asking for is the right to carry firearms onto the fairgrounds for the lawful purpose of engaging in commerce. And the commerce is sanctioned by both the federal government and the state government as long as you're engaging in law-abiding activity. The State of California very heavily regulates gun shows. And the county has conceded, and there's even deposition testimony from the California Department of Justice, that the Nordic's gun shows comply with all state and federal laws. So we're not talking about But you're not looking to be able to simply carry a gun into the fairgrounds. Your clients want to engage in commerce. They want to bring a number of guns there and buy and sell. That's correct, Your Honor. So simply saying there is a right under the second amendment or otherwise to bring a weapon there or bring I mean, they presumably had a concealed carry permit. They could bring personal arms in there, right? The California Gun Show Enforcement Act does not permit people with concealed carry permits to have their weapons at gun shows. So no, that's an incorrect statement, Your Honor. They could bring it to the fairgrounds. They could bring it to the fairgrounds at some other non-gun show event. But gun shows, for example, require that people who attend gun shows and handle weapons must have a government so that they cannot be fired. It's illegal for a person to possess both the ammunition for a firearm and the firearm itself at a gun show. Gun shows are very strictly regulated both for safety and also And that's what they want to do. They want to engage in gun selling, right? Our position, Your Honor, is that as long as we're following the rules of the Gun Show Enforcement Act of 2000, there is that the sale of guns at gun shows is indistinguishable from the sale of books at a book fair because they are rendered inert, we are heavily regulated, and that the county can point to no crime problem with the gun shows at the fairgrounds prior to this order. Are you saying that the Nordikes do not want the right to carry a concealed weapon onto the fairgrounds so that they can protect their inventory from theft in case someone tries to rob them? We're required, Your Honor, to submit, for instance, security plans. And typically the duty sheriff's deputies at all of the venues they go to, to both protect their inventory and make sure that the gun show is conducted in accordance with the law. In addition to that, the off-duty peace officers, the Nordikes also hire private security. So the inventory is protected. The number of entrances and exits to the building are heavily controlled so that it's virtually impossible to engage in a kind of a smash and grab theft of guns. So, Your Honor, can you help me with the interplay of the state and local laws to which you made reference earlier and the discussion in Heller with respect to the scope of the Second Amendment insofar as the sale of guns. Specifically, the court says, although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding procedures, and it goes down to include conditions and qualifications on the commercial sale of guns. So the court at least seems to say whatever the extent of the Second Amendment, nothing that they have written in Heller suggests that limitations on the commercial sale of firearms and conditions and so on is affected by this. It's presumptively good. So you mentioned earlier the state regulations. As we construe the constitutional aspects of this, is the scope of the constitutional right under the Second Amendment defined in some way by the extent of state law? So, for example, if the state law says that you cannot carry AK-47s or, for that matter, a Ruger or whatever on the site, that that means that the Second Amendment doesn't cover it, as we just discussed here? I'd like to answer your question, Your Honor, by referencing a passage from the dissent in Heller v. District of Columbia, which we cited in a supplemental brief, where Judge Kavanaugh in his dissent basically stated that in his view, Heller and McDonald leave little doubt that courts are to assess gun bans and regulations based on text, history and tradition, not by a balancing test such as strict or intermediate scrutiny. So what we have to do is take a look at the text and history of gun regulations that may have coexisted at the same time that the Second Amendment was ratified or at the same time that it was incorporated. And so it's important to note that the gun shows are what was longstanding at the fairgrounds. The ordinance is a new development. It is something that came about in 1999 after there had been the ---- But you added some language to what Judge Kavanaugh said. You said, at the time of the Second Amendment. Does he say that? No, he does not say that. That was my addition, Your Honor. Okay. So you sort of added that. That was not my intent to alter the citation. Well, but you did. It says history. History is a long time. History goes from Adam to today. And you want to focus on the passage of the Second Amendment, which puts us somewhere in the late 18th century, right? But why isn't history what happened in the last 50 years? Why isn't history what's happened in the last 100 years? Well, many of these weapons that we're talking about today have been developed. They didn't have flintlocks in 1787 or 1889 or whenever the Second Amendment was ratified, right? They didn't have revolvers. They didn't have gatling guns. They didn't have automatic or semi-automatic rifles. Right. So why is the history at that time is what matters. Why don't we look at the history of the last 50 or 100 years and say, boy, when it comes to regulating the sale of guns, we have been almost uniform in society in, you know, quite strict about regulating the sale of weapons. And why isn't that consistent with Judge Kavanaugh's view? Actually, Judge Kavanaugh does go on to state that when there are modern instances of regulations that did not exist or modern instances of weapons that did not exist at the historical time of the ratification and incorporation, that a court should argue by analogy but still based on history, text, and tradition. And so you'd have to look for a lineal descendant of a regulation that existed and that is today mirrors. When did gun shows arise, the sort of mass sale, and when did the regulation of them arise? Was it more or less contemporaneous? I mean, I think that's maybe behind Judge Kuczynski's question. If it isn't, it's my question. Yes, Your Honor. The earliest instance that we can find of an advertised gun show was, I believe, in the 1930s, which is around the same time that the National Firearms Act, at least at the federal level, was instituted in that decade. That's when they made machine guns illegal, right? Right around then. Actually, Your Honor, the National Firearms Act imposed a tax and a requirement that you seek local law enforcement approval for the possession of machine guns. It did not outlaw them. The outlawing of machine guns... Well, they're not even outlawed today. You can get a permit from Treasury, right? They're very difficult to get, Your Honor, and they're almost impossible to get in California. Right, so for a practical purpose, made it illegal. Yes, Your Honor. Counsel, maybe this is... Oh, sorry. I didn't want to interrupt the Chief. No, all right, all right. So really, we need to focus on the law. We need to focus on the last 70 or 80 years, right? That's correct, Your Honor, except that there may have been public gatherings that were not called gun shows that existed prior to the 1930s, where people would simply gather at perhaps county fairs or perhaps local marketplaces and talk about their guns and talk about different developments and different technologies and engage in commerce as well. I just don't have... Maybe they were blogging about it. I don't know. They weren't blogging about it, but I just don't have any hard data to give the Court on. Why don't you turn to Judge O'Scannell's question? Yes. Well, I'm just wondering whether we shouldn't get into this level of scrutiny. You filed a petition for this Court to re-hear the case in bank, emphasizing your preference that strict scrutiny should apply. Judge Gould, in his concurrence and dissent, suggested that a reasonableness test should apply. The majority opinion suggested the substantial burden test, which I kind of look at as kind of a Goldilocks test. It's neither as deferential as reasonableness nor as demanding as strict scrutiny. And it appears from our research that all five circuits, other than ours but including ours, but in addition to ours, I should say, have concluded that the proper test, at least at this stage, is the substantial burden test. Why can't we apply the substantial burden test given the, let's say, relative imprecision of the allegations in the complaint as it presently is? Now, it may go back, in which case you'll have the opportunity to refine it and perhaps to suggest there's some direct connection between the right to purchase a weapon at a gun show and the right to protect oneself in his person, whether it's in the home or whatever. Why isn't the substantial burden test appropriate at this stage? We would contend, Your Honor, that it's not appropriate because it is, in a sense, a balancing test. And a balancing test was specifically rejected by the majority opinion in Heller. That was the test that Judge Breyer urged, and it was specifically rejected in both Heller and McDonald. Our position is that – our position has actually somewhat evolved, and we haven't re-briefed the case. Because doesn't strict scrutiny involve some balancing, too? Strict scrutiny is another balancing test. And you were asking for strict scrutiny, but now I'm understanding you to go with what Judge Kavanaugh is saying and I think also, which was in a dissent, and Judge Elrod, in a recent case out of the Fifth Circuit, takes the similar view that to assess gun bans and regulations based on text, history, and tradition, not by a balancing test such as strict or intermediate scrutiny. So have we moved our request? I believe that I have to move my request, Your Honor, because that has been the development of the law in the other circuits after we filed our petition for rehearing. The Heller – the Heller 2 decision and Judge Kavanaugh's dissent came out in October of last year. The recent Houston decision with its dissent is just a couple of days old. So is that a better standard for you than strict scrutiny? Our position, Your Honor, is that it is either the correct standard or that it should be used as an alternative to the Ezel almost strict scrutiny out of the Seventh Circuit. Well, I'm a big fan of Judge Kavanaugh, as you might imagine. But I'm not sure why his opinion helps you. How would you analyze it under his standard? Well, the – there's actually a two-part analysis, Your Honor, and that is we have to look at both the right in text, history, and tradition, and we also have to look at the regulations that coexisted and were presumptively legal at the time. And the – I'm sorry. At which time? At the time that the – I would assume that at the time that the lawsuit was brought and the regulation that's being examined is being taken – being given a look at. Okay. I want to get back to what Judge O'Scanlan mentioned, though, and that is what – whether the pleading and information that we have before us permit us to get to the standard of review. He asked in the concept – in the context of the standard that was proposed, the Goldilocks standard, or whether you say that or strict scrutiny or whatever it is, when you look at what the Supreme Court said in Heller, and they're talking about the scope of the Second Amendment, they suggest that the sale of guns may not be included within the protection of the Second Amendment. I know – I would agree with that. I don't think the Court's saying they won't get there, but they haven't gotten there yet. So if you say, for example – and that's all it is, is an example – let's say that the Supreme Court does not intend that the sale of guns is covered within the Second Amendment – I'm not saying they will, but just hypothetically – then we don't need a standard of review other than just how you would review a normal statute in terms of rational basis or something, which is kind of the bottom drawer, which is not what you're looking for. Isn't it really better for you to get more on the record so that you can show that, in fact, there is a clearly constitutional protected right? For example, if you were just selling handguns for use in the home, no question. You're covered under Heller. You're covered under McDonald. And then the idea that there's no balancing test clearly applies because the Court said it doesn't apply. On the other hand, if you're selling the old AK-47 thing, whatever the state law says, there may not be a Second Amendment protection, and therefore, we don't need to get to the standard of review. So again, back to Judge O'Scallion's question, don't we really need to send this back to the district court to determine what the facts are so we determine whether there is, in fact, a covered activity before we determine what the standard of review is? If I understand the Court's question correctly, is that you're saying that we have to engage in a scope analysis first, and we need facts to determine whether or not the gun show activities are even within the scope of the Second Amendment, and if it's not, I'm out of court. I guess that's exactly right, because if we don't know what the scope is, let's say hypothetically, if whatever you're doing is clearly not covered, say, for example, you're going to sell guns to felons, we know that's not covered. So you don't have to worry about the standard of review. So I'm struggling with how, since we're not supposed to get to the constitutionality of a law unless we have to, how we get to it until we know what the scope is, and how do we know what the scope is until we know what you're doing? Your Honor, we do have a joint statement of undisputed facts that lists, I think, 88 separate facts, and I don't have a direct citation in front of me, but I believe that one of the facts clearly states, and of course it's not part of the complaint, so we're not analyzing the complaint, we're analyzing the joint statement of undisputed facts, that the plaintiffs intend to engage in lawful commerce of firearms at the fairgrounds. So I would think that if that's already an undisputed fact and part of the record, the court has enough to say, well, we know that's going to be pled, and therefore that is either within the scope or not within the scope of the settlement. That relates then back to the State law issue, does it not, where you're in effect letting State law determine what your constitutional rights are? I don't know that we're letting State law determine it, Your Honor, but I think what we're doing is we're saying that these plaintiffs have not challenged the State's ability to regulate very strictly the commerce and firearms that occurs at gun shows. And I see I have six minutes left. I'd like to reserve the rest of my time. Can I ask one quick question? Yes, Your Honor. Under your theory of the Second Amendment, could a city enact a zoning ordinance that would prohibit gun sales within 100 feet of a school? Probably. Thank you. I think I'll reserve the rest of my time. It's the quickest answer I've heard in a long time. Good afternoon. Peter Pierce of Richards, Watson & Gershon appearing on behalf of the appellees. May it please the Court. This case concerns the extent to which Alameda County may regulate on its own property the possession of firearms for display and commerce. The county allows firearms at gun shows as long as those firearms are secured when they are not in the immediate possession of the authorized participant. This case is not about firearms in the home or on other private property, and it's not about possession for self-defense. The appellants have made it plainly clear that their gun shows are about displaying and selling firearms. So the question before this Court from the county's perspective is whether or not the Second Amendment forces the county to allow the commercial sale of firearms on its own property without the conditions that the county wants to impose to ensure the safety of thousands of invitees to the county fairgrounds annually and to avoid the risk of liability that may result when firearms are not properly secured. Kennedy. Can I ask you the question? We've had a lot of discussion about the standards of review or whatever we call them. We're going to apply reasonableness, substance of something, two-step test, strict scrutiny, all these phrases which, when they're actually applied, sometimes don't make any difference. But does it make a difference to you in this case which of those standards we apply? Your Honor, so long as rational basis review is off the table and strict scrutiny is off the table, the answer to the question is no. The county's ordinance survives any other plausible standard of review, so it is our view that this Court need not articulate a single standard of review to resolve this case. Including the analysis in Judge Kavanaugh's dissent? Yes, Your Honor. The county is not aware of the standard of review. It's not challenging. I just wanted to make sure that when you answered Judge Reinhart's question, you included that as one of the ones that would. Yes, Your Honor. I included that. I included intermediate scrutiny. I included the substantial burden test in the majority opinion of the panel. Can you explain to me how the case would be analyzed under Judge Kavanaugh's approach? Well, yes. I don't think I finished answering Judge Reinhart's question, but at some point I'd like to. No, no. Go ahead. Yes, Your Honor. Judge Kavanaugh looked to text, tradition, and history. And as far as the county is aware, there is no ‑‑ there was no ‑‑ it was not commonly understood, I should say, at the time the 14th Amendment was adopted, which is the time period we look to under McDonald. Oh, another time period. A local regulation. That's my understanding of McDonald, Your Honor. That we look to the time the 14th Amendment, excuse me, was ratified to see whether or not it was common at that time to hold a gun show, let alone a gun show on county‑owned property. Maybe we should look at the time it was incorporated. Well, even, even, even, even ‑‑ Which would be, what, 2009? Yes, Your Honor. But even, even, even then when it was incorporated, Your Honor ‑‑ Well, no, incorporated is very good for you. Yes, Your Honor. I think the further back we go, the less good it gets. So if we're looking now at 1865 or something, or 1867, what are we, what do we find? Yes, Your Honor. If we look at that time period, it was not common, the right was not commonly understood to embrace a gun show, let alone a gun show on government‑owned property at that time. The type of gun show that the Nordikes conduct is, in fact, of relatively recent vintage. It was not until ‑‑ Isn't that a little narrow to talk about gun shows? Maybe the question is commerce in guns is the more generic question. And this was right in the Civil War. There were lots of weapons around, lots of war veterans moving west, you know, bringing their Civil War vintage rifles and revolvers with them. If my impression of history, and I'm not a historian, is that it was pretty easy to buy and sell guns and weapons in those days. And it was an unusual town like Tombstone that would make you leave your weapons and went into the town, right? Yes, Your Honor. The more common thing was that this was just something everybody had. Yes, Your Honor. And guns may readily be acquired and sold during the gun shows. All Alameda County is saying is that in order to bring guns onto government‑owned property to sell them, they have to be secured when they're not in the possession of an authorized participant. So this ordinance does not ban gun shows, nor does it ban the sale of guns. At most, it is an incidental burden on the sale and possession of firearms. I didn't understand when you said, as long as the court doesn't come out with strict scrutiny or rational basis, it seems to me under rational basis, everything, it's really easy for ordinances to be found constitutional. Well, the reason I discounted that, Your Honor, is because under Heller, that's off the table, and we know that rational basis review is not allowed. So you think that that's just, you're accepting that? Yes, Your Honor. Okay. For purposes of ‑‑ Under protest, but. Yeah. Yes, under protest, but I think the Supreme Court speaks more forcefully than I do before this panel. Clarify for me. As I look at the ordinance that was being challenged as being vague and overbroad, it seems to just ban having guns on county property and some private property. I didn't see that it was specifically aimed at either gun shows or commerce. Am I wrong about that? It's not specifically aimed at gun shows or commerce, Your Honor. In fact, subdivision F4 of the ordinance creates the exception that's at issue here that allows any type of event to occur on the county fairgrounds. That's the entertainment. So to the extent it's a flat ban on possession, carrying guns on county property, and some private property, as I read it, don't you need to say that that is not overly broad and vague in order to say that the complaint doesn't state a cause of action? Well, Your Honor, the ordinance does not ban the possession on private property. It just impacts it. Well, it says some private property if it's being used for a public purpose. So it's not even limited just to county property as I read it. Well, Your Honor, the definition in subdivision C of the ordinance, the way I read that, does not include private property. It talks about a public or a private entity under contract with the county, but the county's ordinance does not, the prohibition does not reach onto private property at all. We're talking only about county-owned property or property that the county has leased here. All right. And so for all of that, regardless of whether it's a gun show or not, it bans the possession on county property, correct? Yes, subject to the exception subdivision F4, which says any event may occur at the public fairgrounds or on county-owned property so long as the guns are secured when they are not in the immediate possession of an authorized participant at the event. So they're not banning possession across the board. They're banning possession only insofar as that exception is not complied with. In fact, the panel opinion noted in footnote 4 that the Second Amendment claim here stems wholly from the Nordyke's inability to conduct a successful gun show. So this is not, the question before this Court is not whether the Nordyke's may conduct any gun show. It's whether they may conduct what they perceive to be a successful gun show. And the undisputed evidence in the record is that the Nordyke's gun show are characterized by some guns that are tethered to the tables or cabled to tables. They're secured. But the testimony that was unrefuted is that there were hundreds of firearms strewn unsecured across tables. All the county is saying is that those firearms need to be secured in order to comply with the ordinance. So gun sales may occur so long as that exception is complied with. So from your point of view, this case is about regulation, not denial. That is correct, Your Honor. This case is about regulation, what we would call an incidental burden on any right to sell firearms. But just a quick follow-up. Are these requirements in addition to State law? Yes, Your Honor. They are in addition to State law. As the California Supreme Court held a decade ago in this case, they are not preempted by State law because, in fact, they add to State law. State law does not regulate the number of firearms that may be brought onto county-owned property. And so what this ordinance does is it precludes the situation where you would have an unlimited number of firearms coming onto the public fairgrounds in an unsecured state where they can be handled by an unlimited number of people. So if the Nordykes put a steel cable with a cable lock through the barrel of each of these firearms and laid them on the table, would that be secured within the meaning of your ordinance? Yes, Your Honor, it would be. Okay. Is preemption an issue in this case? No, Your Honor. Preemption is not an issue in this case. There was a supplemental authority filed by my colleague, Mr. Kilmer, last week that called the Court's attention to new California law with respect to the open carry of unloaded firearms. And the State legislature has seen fit to exempt from the criminal prohibition firearms at gun shows. But as we know from the California Supreme Court's decision in that case, accepting an activity from criminal prohibition is not the same as mandating that a local government allow that activity. So just because that's exempted from criminal prosecution at the State level doesn't mean that Alameda County is forced to allow it. And that question has been decided, so we do not believe that preemption any longer is on the table. The county adopted this. May I ask one question? Yes, Judge Prager. Is there a First Amendment element in all of this? I thought, I'm not sure whether you conceded that or not. Your Honor, there is a First Amendment element. As this case was originally filed and adjudicated at the summary judgment stage in the district court and briefed and argued to the panel some nine years ago, it involved the First Amendment and as applied challenge in particular. And the district court found that the First Amendment was not offended by the application of this ordinance to the Nordykes. The county conceded that there was some expressive conduct, that there was an element of expression inherent in the possession of a firearm, conceded that for purposes of summary judgment. The district court, understanding that concession, found that the regulation as applied was a reasonable time, place and manner regulation. That particular finding was not challenged by the appellants. The court alternatively also found that the ordinance survives the First Amendment under the O'Brien test. I know that. What is the expressive element? Well, Your Honor, we're not sure. I think that the Nordykes can answer that question. The county just assumed for purposes of argument that the possession of a weapon had some sort of expressive element to it. Well, in the stipulated facts, some of the plaintiffs described what they thought they were expressing. So perhaps that was it. But I guess following up on Judge Pegersen's question, I had a similar question, which is, is the only thing that is left procedurally in this case the Second Amendment claim as it reaches this stage? Well, my understanding is the appellants are challenging the grant of summary judgment on both the First Amendment and equal protection claims, and they're challenging the district court's denial of their motion to amend their Second Amendment claim. So those claims, in your view, are still alive? Those claims, they have been challenged and preserved before this Court, yes, Your Honor. The county adopted the ordinance in furtherance of its role as proprietor of its own property. The county has a duty under California law to manage the fairgrounds for the benefit of its inhabitants. A principal purpose under state law of the county fairgrounds is the conduction of the agricultural fair. And under state law, the county is not allowed to ‑‑ the county is not to permit uses of the fairgrounds that interfere with the agricultural fair. Do we know, does the record reflect, have there been gun shows on the county fair? I'm sorry, Your Honor? Have there been gun shows on the county fairgrounds conducted? Yes, Your Honor, the Nordykes conducted gun shows on the county fairgrounds. For how many years? I mean, it goes back a while, does it not? My understanding is the Nordykes conducted gun shows on the county fairgrounds from 1991 until 1999. That's when the ordinance was passed. It's now being challenged. Yes, Your Honor. I really meant since then. I mean, there are other people who put on gun shows, right? Yes, Your Honor. They're not the only ones. Has anybody else been able to conduct a gun show? I'm not aware of that, Your Honor. The record doesn't say. The record doesn't reflect that, and I don't know the answer one way or the other. Certainly, other gun show operators are eligible to conduct gun shows on the county fairgrounds, so long as they comply with the exception in Subdivision F-4. But we don't have any discovery on that issue, do we? We don't know how many guns are sold during these gun shows, how that compares with sales from gun stores in Alameda County. That simply is not before us. Those particular items of information are not in the record, but what we do know from the record is at the time the ordinance was adopted, there were 29 licensed firearms dealers in Alameda County. We know there are 109 licensed firearms dealers reflected in the record in Contra Costa County. We also know that from February of 2003 to June of 2005, there were 242 gun shows conducted in California. I guess my question, the question I'm getting at is, you seem to take the position that you could run a gun show and comply with the ordinance. They just have to put little cable locks on the guns, and that would be that. Actually, you know, I don't know enough about gun shows and how they operate to know whether, in fact, what you're saying is true, and maybe we need discovery for that. I don't know. If the ordinance is, in effect, a prohibition, although it's not so much whether it's such a prohibition, if it's an effective prohibition, then we have a different case. And if it is, well, we have certain restrictions that could be complied with. Do we know the answer to that question? We don't, Your Honor. But there are – You don't have any other examples of gun shows being conducted in compliance with the ordinance? Not that's – not that are reflected in the record, Your Honor. But the county's position is that does not warrant remanding the case for further factual development. Regardless of the reach of the Second Amendment, whether it extends beyond the home or not, a question which this Court certainly need not decide. The Court can assume that it might extend beyond the home. And the ordinance should still be upheld here. We know that the core right protected by the Second Amendment is self-defense. We know from the allegations in the appellant's own complaint. Yes. That's a way for you to win, and that would be a way of saying we don't have to allow any gun shows. We could just prohibit it altogether. So it doesn't matter whether you could or couldn't. We just prohibit it altogether, and that's okay. And I'm willing to talk about that. But I heard you saying earlier when you were talking about cable locks and the like, oh, don't worry. This is really not a prohibition. This is just a regulation. You can run a perfectly good gun show by complying with it. That's a very different argument. That's an argument that, in fact, you can conduct a gun show even given the regulations, even given the ordinance. If you want to stick by that, we need some examples. We need some proof of that. You could also win by saying we don't have to allow gun shows. We could prohibit them altogether. There's no core First and Second Amendment right. Well, if that's where you want to go. Well, it is the county's view that they could prohibit gun shows altogether on county-owned property. And how would we analyze that? Let's say we then treated it as a complete ban. Since we don't know whether it is a complete ban or not, if we treat it as such, then how do we analyze that? Well, Your Honor, there are alternative venues where gun shows could occur. The ordinance would reach only county-owned property. It wouldn't reach private property. We know from the record. What about the thing that Judge Ikuda was talking about, private property that's being used for a public purpose? Well, the ordinance does not regulate private property, Your Honor. All it does is prohibit the possession of firearms on county property, what's defined as county property under subsection C. Well, you would concede, I'm pretty sure, that if an ordinance had the effect of making it impossible for a homeowner to get a gun, that that burden would be such that you couldn't overcome that, right? If the ordinance made it impossible for a homeowner to purchase a weapon to defend themselves. Or so difficult. Or so difficult to purchase a weapon in the home, yes, I think that would come much closer to the prohibition in Heller than it would to the presumptive and valid categories of regulations or the types of those regulations. Do you mean that if the regulation made it impossible or close to impossible to purchase a gun within the county or on county property? On county property, Your Honor. I don't know. Oh, I'm sorry. I'm sorry. I don't. I mean, if the ordinance made it impossible to purchase a gun in the county for. Yes, or on county property. Which of the two was your answer to the question? My answer to Judge Callahan's question was with respect to making it impossible to purchase a weapon at all. So I took that to mean throughout the county, both on private property and on government property. Could you have wet counties and dry counties? Yes, Your Honor, you could. And I get back to the historical understanding of what was the right to bear arms before the Second Amendment was adopted and at the time the ratification of the Fourteenth Amendment, there was no commonly understood right to possess a firearm at a gun show, let alone at a gun show on government-owned property. We're talking about the right to procure a weapon, to buy one right now. Yes, Your Honor. Not to own, because we're past the ownership thing, right? So the question is what evidence is there historically as to the level at which. I mean, historically, you know, the example I gave of liquor has been it's done by the county. You could have, certainly by the state, but often by the county or city. You could have blue laws, you know, bars are closed on Sundays in the city, wet counties, dry counties. That's sort of the level at which liquor is regulated traditionally. I just don't know how traditionally weapons are regulated, have been regulated in this country and what we look to. Well, historically, we know, Your Honor, the Supreme Court in Heller looked at English common law and looked to Blackstone, and Blackstone wrote of the statute of Northampton in 1328, and that statute prohibited the possession of guns in public fairs and public markets. The opinion of the court in Heller also references the Pennsylvania Ratifying Convention in Philadelphia in 1787 and cites to some extent the view of the Anti-Federalists that the Second Amendment protected an individual right to keep and bear arms, but even the Anti-Federalists remarked that that right would not extend to a situation where there would be public injury, a situation like that before this Court. And we know at the time the 14th Amendment was ratified that there were several states that regulated the possession of firearms in public places. So there are historical antecedents for the county's regulation here. So just on the scope issue, I know that's not where you want to go, but I want to be sure I understand the county's position. Is it correct to say that as far as the county is concerned that the record we have right now, which has really no specificity as to the type of firearms, other than I think Mr. Kelmer said that we could assume that because the state regulates these things that we could assume that only those things that are permitted by the state are covered? But putting that aside, is it your position, we don't need to send this back to the district court to get more facts because we can just assume, based upon the way the ordinance is worded and the way the state statute is worded, that this survives certainly intermediate scrutiny, certainly would survive rational scrutiny, and we could just go ahead and be done with it. Is that your position? Yes, Your Honor. Based on the evidence in the record and based on the statements made in the proposed second amended complaint and in the operative third amended complaint, the third amended complaint states, and I'm quoting here, guns at gun shows are not weapons. They are not being used to protect life or property. So self-defense is not a reason why the appellants wish to possess weapons on county-owned property. That discounts, of course, the point that Judge Callahan referred to and the Supreme Court did as well, which is if you can't get a pistol, for example, to protect yourself and your home, which is clearly a court function, you're saying you have to take that out of the equation, right? Otherwise, your analysis works. Yes, Your Honor. That's correct, if I understand your question. Counsel, none of those amended complaints that are in the record were filed after McDonald or Heller. These were all pre-McDonald and pre-Heller filings, were they not? That's correct, Your Honor. But because this ordinance at most has an incidental burden on any right to acquire firearms and because it involves government-owned property where the government is proprietor and is charged with protecting the safety and well-being of the thousands of invitees who come onto its property and who congregate in close proximity to one another, and because there are events that occur simultaneously with the gun shows, antique shows and pet shows, where children are present, and because the ordinance was adopted in the wake of a mass shooting, the July 4th, 1998, fair. But there wasn't any gun show going on when that happened, was there? That's correct, Your Honor. There's no nexus between gun shows and violence on the county fairgrounds that was of concern. That is correct, Your Honor. And there need not be under the First and the Second and the First and Second Amendment in order for the as-applied challenge to fail. So if I understand your argument, you're saying that because this regulation is minimal, that anyone who wants to acquire a weapon for self-defense in Alameda County can still do so either at a gun show on the county property, if things are secured properly, or on private property in Alameda County. That is correct, Your Honor. One other item that I ---- Before you get to the other item, I'd like to go back to before. Let's assume for a moment that you can't really acquire guns at a gun show under the conditions that the ordinance prescribes, which I think is what your opponent is saying, that a gun show won't be successful under the conditions that the county imposes. Let's assume that for a moment. I had thought that as long as people could acquire guns for self-defense in the homes throughout the rest of Alameda County, that there were plenty of places to obtain guns, that you were saying, therefore, merely prohibiting, in effect, gun sales on county property was all right. But I also heard you say when I tried to find the answer, and I think I misunderstood you, that you could completely ban gun sales in Alameda County. No, Your Honor. I misspoke. If Your Honor drew that impression, that was my fault, and I apologize. I'm not saying that the county could completely ban gun sales countywide. That would be much closer to the type of regulation in Heller that was found unconstitutional and, of course, is miles from the fact pattern that is now before this Court. One other item that I wanted to mention to the Court is that ---- That is correct, Your Honor. I think that's what I heard you say. Yes, Your Honor. There is a letter in the record that is dated August 23, 1999, from then County Counsel Richard Winney, which was a letter written to the manager of the fairgrounds stating that at the time, the Nordikes could not conduct a gun show on the fairgrounds with guns. And that is because at that time, the ordinance did not include the exception. The exception was adopted five weeks later on September 28, 1999, and the county had asked the Nordikes to submit a written plan as to how they would conduct their gun show in accordance with the ordinance, and that written plan was asked to be submitted on the 20th of October, 1999, some three and a half weeks later. So the original letter from Richard Winney, and I just wanted to clarify this for the record, was with respect to the original iteration of the ordinance, not with respect to the amended iteration of the ordinance, which allows gun shows to be conducted so long as they comply with the exception that was added, subdivision F-4. Mr. Pierce, the ---- when you were saying what standards of review you could live with, as long as it wasn't rational basis, as long as it wasn't strict scrutiny, you said that you could even live with what Judge Kavanaugh and Judge Elrod were saying. It seems to me if this Court were to hypothetically, if that were to be the standard, it just seems it would have to go back. I don't see how this record could tell us whether they could state a claim or not. Well, Your Honor, we would ---- I mean, this record is very different relative to if that were the standard of review. Well, Your Honor, we know from this record that we are dealing with here is a gun show on government-owned property. And there is no evidence that there was a commonly understood right in any of the relevant historical periods that gun shows could be conducted on government-owned property. If we can leave the gun show out of the equation even, that there was even a right to possess a weapon on government-owned property. And if there was that right, perhaps it might have involved self-defense. But, again, self-defense is not an issue in this case, and appellants have admitted as much. So it is the county's position because of all of the parameters of this case and the narrowness of this case, and the factual record as it exists, there is no reason to send this back for ---- to allow the appellants to try and replete their Second Amendment claim because the record is sufficiently fleshed out factually, the theories are sufficiently narrow, and the ordinance regulates sufficiently narrowly that remanding this to the district court would be futile, I think, as Judge Graver mentioned a few minutes ago. Appellants' counsel said if they wanted to do a gun show within a certain number of yards of the school, that that would probably be fine. What about if the government wanted to outlaw possession of a weapon within 500 yards of the school, but my backyard backs up to the school and I have a gun in my house? Your Honor, that presents a far more dauntingly nuanced scenario than is before the court today. And there would be tension there between the individual right to possess a weapon for self-defense in the home and the recognition in Heller that regulations within ---- or regulations of weapons within certain distances of sensitive places, if you will, I know the court just talked about sensitive places, may be presumptively valid. But fortunately, this Court is not faced with that type of scenario. If I may briefly conclude, rules of law often develop incrementally in constitutional law. And it is appropriate to exercise restraint when the facts of a case allow the court to rule narrowly. And the facts of this case allow the court to rule narrowly. Regardless of the plausible standard of review that applies, the county's ordinance survives scrutiny. And whatever the dimensions of the Second Amendment, whether it reaches beyond the home or not, whether it implicates some right other than self-defense, the ordinance must be upheld. The county respectfully requests that the court affirm the summary judgment of the district court and affirm the order denying the Nordykes' request for leave to amend their Second Amendment complaint and not remand this case for any further developments. Thank you. Thank you. Mr. Kilmer. Thank you. I'd like to pick up where my opponent left off with regard to this August 23, 1999 letter from county counsel. The county is now taking a position, which is the only position they can take given the development of the law, that, gee, the Nordykes could have had their gun shows all along if they had just sought permission to comply with our ordinance. The problem is that the factual record is very clear in the Joint Statement of Undisputed Facts. Statement of Fact 14, for example, refers to this August 23 letter. We had written several letters to county counsel before we filed the lawsuit asking them, does our gun show or can our gun show be operated as an exception to your ordinance? They didn't even respond to our letters. Then we got a copy of this letter from Mr. Winnie to the fairgrounds manager saying that the ordinance does not ban gun shows. I'm not sure we're going with this. They said you could do it now. They did it in court. They are judicially assault. So you won. So why don't you go home? So if that's the case, we should just stop right here, send it to our mediation office, take a counsel statement, turn it into a stipulation, and we're done. Are you ready to concede? Are you ready to accept that you could run a gun show subject to those regulations? No, Your Honor, and that's our point, is that the county has always interpreted its own ordinance. And then in the Joint Statement of Undisputed Facts, county counsel is the official in the county authorized to interpret the ordinance, and county counsel said you can't display guns at gun shows. He didn't say you had to tether them to the table. Judge Kaczynski's question, as I understand the question now, it is the conditions that opposing counsel has stated here today are only conditions that there be a method of securing each of the firearms at the gun show and that they can be displayed as long as they're tethered to something solid. And I guess the question is, if that's an acceptable method of having a gun show, what is for this Court to do? I mean, why do we continue? It's a very good question, Your Honor, in which case we've engaged in 12 years of litigation. This is why two of us have now asked you the question. So let's not evade it. Let's not. Just answer it. The answer is no, Your Honor. We can't conduct a gun show based on what this ordinance says and based on what the ordinance was interpreted to us by county counsel. That's not the question that's being asked of you. The question is whether your clients could conduct a gun show if they secured each of the firearms to a solid fixture on the county's fairgrounds property. I don't even know what that would look like, Your Honor. Counsel? Yes, Your Honor. You've got a choice. Yes, no, I don't know. The answer is no. We cannot conduct a gun show with guns tethered to tables. Why not? How about if there's a cable lock through the barrel? Most of the gun show, quite a few of the gun show exhibitors do run cables with alarms through them for the tables that are on their table. And in addition to that, the guns are secured in accordance with the Gun Show Enforcement Act. There's nylon ties that are required to be on every firearm so that the firearm cannot be manually operated. Well, if that's the case, then in response to my question to Mr. Pierce, you can comply with the ordinance. That was our point, Your Honor. When we were asked to submit a plan, what I did is I wrote a letter to the fairgrounds manager saying we will comply with all our contractual obligations and we will comply with all state and federal laws, including the state law that says our guns will be secured with nylon wraps when they're on the table. So what is it in the county ordinance that you can't comply with? Well, because the county interpreted its ordinance, Your Honor, to us that you cannot display guns at the fairgrounds. But that's not what they're saying anymore. And it may have taken a long time for everybody to get to this point as the law has evolved. But the question now is not whether they were wrong in 1999. They may very well have been utterly wrong in 1999. But today they're saying something completely different. Well, then they would have had a duty, Your Honor, to let us know that. Well, that's fine. But we are not interested. We're interested in the answer to the question, why is it you can't run a gun show given what they've now said the conditions are? We cannot run a gun show with guns cabled to a table, Your Honor. The guns have to be able to be picked up. They have to be able to be inspected. Well, cables can be pretty long. You can pick them up. I would argue, Your Honor, I've seen cables five, maybe ten feet long cables, believe it or not. Cell phones are sold that way. Yeah. And if the county wanted to draft an ordinance that said that. No, no, no. I'm not going to let you get away. Why can't you run a gun show with guns tethered to cables? Five-foot cables, ten-foot cables. What's the impediment there? I can imagine circumstances under which it would be possible to run a gun show that way, Your Honor. Okay, case over, right? You no longer have a controversy. Why isn't that the end of the case? Because that's not the way that the county has interpreted the ordinance to us. They just told us they did. They told us that after 12 years of litigation, Your Honor. And perhaps we should have a hearing over whether or not they've forced us to incur fees and costs that we didn't need to incur if they could have settled the case by just telling us, you know, attach a cable to your guns. Well, that's certainly a possible outcome. Once the case is over, we can talk about who pays fees for whom. But I hear you to agree now that, you know, the restrictions that they imposed can be complied with. No, Your Honor. I'm telling you that because I heard it for the first time today that a cable attached to a gun would be acceptable to the county, that I can imagine. I would think you'd be doing cartwheels. Except it wouldn't be Becker's. But you'd be very happy you've gotten a second. I might injure myself as well, Your Honor. Other than the representation by Mr. Pierce in open court, is there anything in writing that you are aware of that would be consistent with what his representations are today? No. Well, why isn't that a reasonable reading of the section F-4 of the ordinance? Section F-4 of the ordinance, Your Honor, states that the guns must be in possession of the authorized participant. Or when it is not, it is secured to prevent its unauthorized use. And our position is that our nylon straps required under State law are secured. Well, then all you're arguing about is plastic straps versus cables. You're no longer arguing about grand principles. It would have been nice if they had told us that 12 years ago. Well, if magic happens in this big room. Yes. I see that my time is over, but I'm happy to answer any further questions. Thank you. Thank you. Mr. Pierce. Yes, sure. Go ahead. Well, oh, yes. The county stated in its motion for summary judgment at the district court that the word event in subdivision F-4 could be read broadly to include any event, including plaintiff's gun shows. And the district court made a finding, and I'm quoting from the order granting summary judgment, that the ordinance preserves the possibility that any number of events can satisfy the exception, including plaintiff's gun shows. We had been up front about this every step of the way. It's on page 15 of the answering brief we filed in this court in January of 2008. Thank you. Well, can you state here that what we've been talking about would be acceptable to the county? Pardon, Your Honor? You are presenting to this court that a gun show with tethered guns would be acceptable to the county. Yes, under subdivision F-4, which I was just mentioning as part of the district court findings. Yes, Your Honor. Notwithstanding what Councilwoman King said in support of the ordinance in the first place. Yes, Your Honor. That was Councilwoman King's own view. There is no evidence in the record that that view, which was a strident view, was shared by any other members of the Board of Supervisors. Very well. Thank you. Okay. Thank you, Kish. This argument stands submitted. We are adjourned. All rise. Good job. Good job.
judges: Kozinski, Pregerson, Reinhardt, O'scannlain, Hawkins, Graber, Gould, Tallman, Callahan, M Smith, Ikuta, Cjj